E-FILED
Thursday, 13 August, 2020  03:52:43 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-30079 |
| | ) | |
| DELBERT EUGENE MARSHALL, | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED MOTION FOR COMPASSIONATE RELEASE

Defendant Delbert Marshall, through his attorney Assistant Federal Public Defender Rosana E. Brown, hereby moves this Honorable Court for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) and The CARES Act, Pub. L. No. 116-136 (Mar. 27, 2020).  Those reasons are: the proliferation of COVID-19 at FCI Greenville combined with the exponential growth of the disease at BOP locations around the country, and Mr. Marshall's pre-existing health conditions that may place him at high risk for severe illness and/or death if he contracts the virus.  In support thereof, he provides the following:

## I.   Introduction

This Court sentenced Mr. Marshall on April 10, 2006, to serve 420 months' imprisonment, to be followed by a 8-year term of supervised release, pursuant to a guilty plea to one count each of Distribution of Cocaine, in violation of 21 U.S.C. § 841(a)(1), Distribution of Cocaine Base, in violation of 21 U.S.C. § 841(a)(1), Distribution of Cocaine Base within 1,000 feet of a School, in violation of 21 U.S.C. § 860, Possession of Cocaine and at least 5 Grams of Cocaine Base with Intent to Distribute within 1,000 Feet of a School, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 860, Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g), and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c).  Mr. Marshall was detained on August 26, 2005, and has remained in custody since that date.  On February 20, 2020, this Court reduced his total sentence to 240 months with 6 years supervised release to follow pursuant to the First Step Act.  His currently projected release date is November 28, 2022.

Mr. Marshall is a 42-year old man serving his sentence with the Bureau of Prisons (BOP) location at Greenville, Illinois.  FCI

Greenville currently lists 1 inmate and 4 staff members with confirmed active coronavirus infections.[1]  Another 1 inmate and 5 staff members have been deemed recovered.[2]  Mr. Marshall suffers from hypertension, for which he takes daily medication, which has been identified by the CDC as a chronic health condition that may place him at risk should he contract COVID-19.[3]  He has recently been diagnosed as pre-diabetic, with an A1C level of 5.9.  Sealed Ex. A at 1.  He was also born with *pectus excavatum*, which is a structural deformity of the thoracic wall in which the chest plate grows inward; commonly called "funnel chest," the sternum and ribcage are abnormally shaped, which limits lung capacity and can result in fatigue or inability to exercise, coughing, palpitations, or shortness of breath, and can lead to serious cardiac symptoms.[4] He was hospitalized in 2017 for having an irregular heartbeat, but

---

[1] https://www.bop.gov/coronavirus/.

[2] *Id.*

[3] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity.

[4] *See* Ron Winkens, et al., *Pectus Excavatum, Not always as Harmless as it Seems*, BMJ Case Rep. (Dec. 14, 2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3029481/; and Mayo Clinic, *Pectus Excavatum: Not Just a Cosmetic Concern* (Oct. 3, 2017), https://www.mayoclinic.org/medical-professionals/cardiovascular-diseases/news/pectus-excavatum-not-just-a-cosmetic-concern/mac-20430716.

further information is unknown at this time; counsel has requested the relevant hospital records and will supplement the record with further detail upon receipt.  Although his hypertension might place him at high risk, he asks this Court to consider the combination of his other health conditions, pre-diabetes, *pectus excavatum*, and possible heart defects, in determining his level of risk.  He proposes that high the rate of infection and numerous deaths within the BOP and various health conditions coupled with circumstances created by the current pandemic warrant the exercise of this Court's discretion in considering his release to an early period of home confinement.

As of August 13, 2020, 112 Bureau of Prisons inmates and 1 staff member have died from COVID-19, and the death toll continues to rise.[5]  This risk is not confined to the elderly—54% of now-deceased inmates, like Mr. Marshall, were under the age of 65.[6]  One hundred and three of those now-deceased inmates, like Mr. Marshall, had pre-existing health conditions identified by the

---

[5] https://www.bop.gov/coronavirus/.
[6] An analysis of BOP Press Releases per death shows that 61 of 112 inmate deaths were individuals under the age of 65. https://www.bop.gov/resources/press_releases.jsp.

CDC as placing them at higher risk for serious illness or death from the virus. [7]  Nine of those now-deceased inmates had no pre-existing conditions at all.[8]

On Friday, April 3, 2020, Attorney General William Barr issued a memorandum expanding availability of home confinement as an alternative to incarceration finding that emergency conditions due to the COVID-19 pandemic "are materially affecting the functioning of the Bureau of Prisons."  Legal experts have implored the Attorney General to expand the home confinement program even further.[9]  BOP's response after the Barr Memorandum has been sparse and non-transparent.[10]  In recent weeks, multiple United States Senators have voiced concern over BOP's flailing

---

[7] *Id.* (looking to press releases void of statements alleging the inmate suffered from pre-existing health conditions).

[8] *Id.*

[9] Brennan Center for Justice letter to Att'y Gen. William P. Barr, *Expanding BOP's Response to the Novel Coronavirus, and Helping States Safely Reduce their Prison Populations* (Apr. 16, 2020), at https://www.brennancenter.org/sites/default/files/2020-04/BC%20Letter%20to%20DOJ%20final_0.pdf.

[10] Forbes, *Lack of Direction from Bureau of Prisons Showing in Federal Court* (Apr. 21, 2020) (describing a lack of guidance to BOP facilities, changes in posture concerning eligibility, and court confusion in general), https://www.forbes.com/sites/walterpavlo/2020/04/21/lack-of-direction-from-bureau-of-prisons-showing-in-federal-court/#74e400a411fe.

attempts to curb the spread of the virus, and their non-responsiveness to the call to release medically vulnerable inmates.[11]

The novel coronavirus infiltrates new facilities daily and has expanded at an alarming rate within the Bureau of Prisons; the rate of growth for which is twice that of the United States as a whole.[12] Exposure could very well result in death for someone like Mr. Marshall. The danger is not limited to serious illness or death, however—permanent organ damage is a rapidly growing outcome among COVID patients. Researchers now know based on experience conducting autopsies and recent research examining CT scans of even asymptomatic patients, "[COVID-19] just destroys the lungs . . . .[w]hen the person dies, you can find lungs that don't

---

[11] Jessica Ladd, *Senator Discusses COVID-19 Threat at Federal Prisons* (June 9, 2020), https://www.kfvs12.com/2020/06/09/senator-discusses-covid-threat-federal-prisons/ (Senator Durbin spoke to Federal Public Defender officials about the failure of BOP to maintain safety for inmates and staff during the pandemic, noting that the BOP infection rate is seven times greater than that of the United States, while they have released only 2 percent of the BOP prison population. Several BOP inmates who have died from the virus were within months of being released.); Brown.senate.gov, *Brown, Kaptur Demand Answers on Spread of COVID-19 at Elkton Prison Facility, Urge Bureau of Prisons to do More to Stop Spread of Virus, Protect Everyone There* (June 8, 2020), https://www.brown.senate.gov/newsroom/press/release/brown-kaptur-spread-covid-19-elkton-prison-facility (describing a letter sent by 4 Senators urging BOP to take immediate action.).

[12] *See infra* n.18 (Table).

look or feel like lungs anymore."[13]  More simply put, permanent

lung scarring is a prevalent concern among virus patients.[14]

Because he has *pectus excavatum*, lung scarring could adversely

affect Mr. Marshall's health for the rest of his life.[15]  This very real

danger is compounded by the infiltration of COVID into his facility.

This Court should grant him compassionate release so that he can

protect himself from exposure to the virus and reduce his risk or

serious illness, death, and permanent organ damage.

---

[13] Jason Lemon, *Coronavirus Damages Lungs of Asymptomatic Patients, Too, Medical Examiner Says*, Newsweek (June 29, 2020), https://www.newsweek.com/coronavirus-damages-lungs-asymptomatic-patients-too-medical-examiner-says-1514084.

[14] "On CT scans, while normal lungs appear black, Covid-19 patients' lungs frequently have lighter gray patches, called "ground-glass opacities" — which may not heal.  One study from China found that this ground-glass appearance showed up in scans of 77 percent of Covid-19 patients. In another study out of China, published in Radiology, 66 of 70 hospitalized patients had some amount of lung damage in CT scans, and more than half had the kind of lesions that are likely to develop into scars. (A third study from China suggests this is not just for critically ill patients; its authors found that of 58 asymptomatic patients, 95 percent also had evidence of these ground-glass opacities in their lungs. More than a quarter of these individuals went on to develop symptoms within a few days.)"  Lois Parshley, *The Emerging Long-Term Complications of Covid-19, Explained* (Jun. 12, 2020), https://www.vox.com/2020/5/8/21251899/coronavirus-long-term-effects-symptoms.

[15] *See* Jennifer Couzin-Frankel, *From 'Brain Fog' to Heart Damage, COVID-19's Lingering Problems Alarm Scientists* (Jul. 31, 2020), https://www.sciencemag.org/news/2020/07/brain-fog-heart-damage-covid-19-s-lingering-problems-alarm-scientists.

## II.    Procedural Status

Mr. Marshall sent a *pro se* Motion for Compassionate Release to the Court on July 1, 2020.  The Court appointed the Federal Public Defender to represent Mr. Marshall for this purpose and ordered an Amended Motion to be filed.

Mr. Marshall made a request for compassionate release to the Warden of his facility in April 2020, and followed up on June 18, 2020.  He has received no response to date.

## III.    Compassionate Release

President Trump signed the First Step Act into law on December 21, 2018.  Pub. L. No. 115-391 (Dec. 21, 2018).  Among the changes in the law, Congress amended the provision on compassionate release at 18 U.S.C. § 3582(c)(1)(A)(i).  The law provides the sentencing judge with jurisdiction to consider a defense motion for reduction of sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  18 U.S.C.

8

§ 3582(c)(1(A); see also First Step Act of 2018, § 603(b), Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018).  Prior to passage of the First Step Act only the Director of the Bureau of Prisons had the authority to file a motion for compassionate release.

This Court has discretion to reduce the term of imprisonment imposed in this case based on § 3582(c)(1)(A)(i), which states in relevant part that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"

## A.    Exhaustion of administrative remedies

As noted above, normally the Court cannot consider a compassionate release motion filed by the defendant unless "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  18 U.S.C. § 3582(c)(1(A).  Mr. Marshall made a request

9

for compassionate release to his Warden in April 2020.  Regardless, this Court can excuse the exhaustion requirement.

This Court has previously found that the immediate danger of serious illness or death from COVID-19 justifies excusing exhaustion of the compassionate release statute's administrative exhaustion requirement.  *See e.g., United States v. Coles*, No. 00-CR-20051, 2020 WL 1976296 (C.D. Ill. Apr. 24, 2020). Appropriately so.  The alarming rise in the number of COVID-19 cases in the BOP shows the danger all inmates face from the virus. The chart below shows the exponential growth in COVID-19 cases in the BOP to date.[16]

| Date | Number of Positive Inmates | Number of Recovered Inmates | Number of Inmate Deaths | Number of Positive Staff | Number of Recovered Staff | Total BOP Cases |
|---|---|---|---|---|---|---|
| 3/19/2020 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3/23/2020 | 3 | 0 | 0 | 3 | 0 | 6 |
| 3/27/2020 | 6 | 0 | 0 | 3 | 0 | 9 |
| 3/31/2020 | 19 | 0 | 1 | 19 | 0 | 38 |
| 4/4/2020 | 75 | 0 | 6 | 39 | 0 | 114 |
| 4/8/2020 | 195 | 0 | 8 | 63 | 0 | 259 |
| 4/12/2020 | 318 | 15 | 9 | 163 | 8 | 481 |

---

[16] Figures collected from www.bop.gov/coronavirus on a daily basis by the Federal Defenders of New York and posted to https://federaldefendersny.org/. "There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases.  *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (Apr. 7, 2020), https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf.

| 4/16/2020 | 446 | 20 | 14 | 248 | 13 | 694 |
|---|---|---|---|---|---|---|
| 4/20/2020 | 479 | 145 | 21 | 305 | 26 | 784 |
| 4/24/2020 | 566 | 248 | 24 | 342 | 52 | 908 |
| 4/28/2020 | 799 | 385 | 27 | 319 | 124 | 1118 |
| 5/2/2020 | 1692 | 426 | 33 | 349 | 132 | 2041 |
| 5/6/2020 | 1984 | 543 | 40 | 356 | 149 | 2340 |
| 5/10/2020 | 3082 | 619 | 45 | 248 | 279 | 3330 |
| 5/14/2020 | 2817 | 1288 | 50 | 262 | 279 | 3079 |
| 5/18/2020 | 2280 | 1950 | 56 | 283 | 287 | 4856 |
| 5/22/2020 | 2267 | 2177 | 58 | 188 | 389 | 5079 |
| 5/26/2020 | 1558 | 3144 | 59 | 186 | 403 | 5350 |
| 5/30/2020 | 1577 | 3180 | 64 | 181 | 413 | 5415 |
| 6/3/2020 | 1649 | 3582 | 66 | 192 | 420 | 5909 |
| 6/7/2020 | 1956 | 3689 | 72 | 176 | 450 | 6343 |
| 6/11/2020 | 2125 | 3975 | 78 | 190 | 453 | 6822 |
| 6/15/2020 | 1374 | 4775 | 82 | 185 | 472 | 6889 |
| 6/19/2020 | 1318 | 4955 | 85 | 164 | 516 | 7039 |
| 6/23/2020 | 1349 | 4975 | 87 | 163 | 528 | 7103 |
| 6/27/2020 | 1386 | 5115 | 89 | 136 | 574 | 7301 |
| 7/1/2020 | 1563 | 5135 | 90 | 152 | 575 | 7444 |
| 7/4/2020 | 1888 | 5134 | 93 | 177 | 584 | 7877 |
| 7/8/2020 | 2267 | 5128 | 94 | 211 | 603 | 8304 |
| 7/13/2020 | 3366 | 5181 | 95 | 257 | 629 | 9433 |
| 7/20/2020 | 4096 | 5488 | 97 | 325 | 642 | 10,649 |
| 7/30/2020 | 3035 | 7429 | 103 | 500 | 683 | 11,751 |
| 8/7/2020 | 1444 | 9375 | 111 | 562 | 756 | 12,249 |

It is important to note that at least one BOP inmate died of COVID-19 related complications after being deemed "recovered" and returned to the general population.[17]

---

[17] Inmate Adrian Solarzano was converted to recovered status on May 10, 2020, after being asymptomatic at FCI Terminal Island, and died 5 days later with chest pains.
https://www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf.

Using only the numbers of currently infected inmates and staff, the growth rate for the virus within the BOP is astounding. The BOP rate of growth dwarfs our national figures as demonstrated below,[18] demonstrating a very practical inability to contain the virus in BOP facilities.

| Date | Number of BOP Cases | BOP Rate of Rise | Cumulative BOP Rate of Rise Since 3/20/2020 | Number of National Cases | U.S. Rate of Rise | Cumulative U.S. Rate of Rise Since 3/20 |
|---|---|---|---|---|---|---|
| 3/20/2020 | 2 | 0.00% | 0.00% | 18,747 | 0.00% | 0.00% |
| 3/26/2020 | 18 | 200.00% | 400.00% | 85,356 | 93.19% | 228.87% |
| 4/1/2020 | 94 | 147.37% | 658.48% | 213144 | 51.27% | 345.21% |
| 4/7/2020 | 313 | 79.89% | 823.47% | 395011 | 29.59% | 417.81% |
| 4/13/2020 | 589 | 22.45% | 899.60% | 579,005 | 17.58% | 460.06% |
| 4/19/2020 | 804 | 6.91% | 934.19% | 746,625 | 12.83% | 487.17% |
| 4/25/2020 | 1047 | 7.16% | 962.87% | 928,619 | 12.09% | 510.23% |
| 5/1/2020 | 2876 | 29.84% | 1086.09% | 1,062,446 | 8.28% | 524.17% |
| 5/7/2020 | 3803 | 23.80% | 1116.70% | 1,219,066 | 5.79% | 538.42% |
| 5/13/2020 | 4772 | 4.83% | 1141.23% | 1,364,061 | 4.87% | 549.99% |
| 5/19/2020 | 5037 | 3.73% | 1146.72% | 1,504,830 | 4.05% | 560.06% |
| 5/25/2020 | 5348 | 1.13% | 1152.83% | 1,637,456 | 4.19% | 568.69% |
| 5/31/2020 | 5913 | 4.12% | 1163.14% | 1,761,503 | 3.71% | 576.13% |
| 6/6/2020 | 6539 | 3.09% | 1173.51% | 1,891,690 | 3.52% | 583.39% |
| 6/12/2020 | 6859 | .54% | 1178.38% | 2,036,429 | 3.30% | 590.90% |
| 6/18/2020 | 6986 | 1.39% | 1180.22% | 2,177,842 | 3.44% | 597.73% |
| 6/24/2020 | 7125 | .69% | 1182.20% | 2,364,874 | 3.14% | 606.15% |
| 6/30/2020 | 7444 | 1.96% | 1186.63% | 2,623,217 | 6.53% | 616.80% |
| 7/6/2020 | 7987 | 2.42% | 1193.81% | 2,911,888% | 6.87% | 627.54% |
| 7/15/2020 | 9730 | 7.22% | 1214.22% | 3,529,899 | 7.42% | 647.42% |

---

[18] National numbers collected by Federal Defenders of New York and posted at https://federaldefendersny.org/.  "Numbers obtained from https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html."

| 7/21/2020 | 10811 | 5.39% | 1225.03% | 3,858,686 | 3.68% | 656.54% |
| 7/30/2020 | 11751 | 2.27% | 1233.51% | 4,472,936 | 4.72% | 671.68% |
| 8/8/2020 | 12293 | 1.35% | 1238.06% | 5,000,352 | 4.12% | 683.04% |

In other words, the curve of growth for confirmed coronavirus cases in the BOP far surpasses the rate for the United States as a whole, and keeps accelerating, depicting a very real and present danger to all BOP inmates and staff.[19]



Not only is BOP's infection rate 5.02 times higher than that of our nation, it also surpasses infection rates around the globe.[20]

---

[19] https://federaldefendersny.org/.
[20] *Id.*

| Location | Cases | Population | Infections/ 1,000 People | Infection Rate as Percent of Population |
|---|---|---|---|---|
| BOP Imprisoned Population | 10,937[2] | 142,071[3] | 76.98 | 7.6983% |
| United States | 5,063,770 | 330,099,864[4] | 15.34 | 1.5340% |
| China | 88,862[5] | 1,394,015,977[6] | 0.06 | 0.0064% |
| Italy | 250,825[7] | 62,402,659[8] | 4.02 | 0.4019% |

| | BOP has an infection rate X times higher |
|---|---|
| Compared to the United States | 5.02 |
| Compared to China | 1207.66 |
| Compared to Italy | 19.15 |

Every BOP inmate is now, right now, at serious risk of contracting the virus whether the particular facility has yet to confirm cases or not. For Mr. Marshall, contracting the virus could result in serious illness, death, or long-term health consequences. Because the virus has proliferated FCI Greenville, where Mr. Marshall is housed, he stands at particularly high risk. This added risk of death is a factor this Court can consider in determining whether to grant compassionate release.

Because the danger of contracting COVID-19 in the BOP is statistically profound and urgent, and because the disease has proliferated FCI Greenville, waiver of the exhaustion of administrative remedies requirement is warranted should this Court determine his prior request to the Warden was somehow insufficient.

14

**B.     COVID-19 provides an extraordinary and compelling reason for compassionate release.**

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction.  Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," (11th ed. 2019).  Its definition of "compelling need," is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]."  *Id.*  The present global pandemic is a quintessential extraordinary circumstance beyond what most Americans have experienced in their lifetimes.  Thus, this Court is authorized to consider that the combination of circumstances provide extraordinary and compelling reasons for Mr. Marshall's immediate release.

> 1.     *The Court Has Authority to Find Extraordinary and Compelling Reasons Other than Those Expressly Identified in the Commentary to U.S.S.G. § 1B1.13.*

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."

15

The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" only in the application notes.  The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances.  U.S.S.G. § 1B1.13 comment. n.1(A)-(C).  The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, comment. n.1(D).

However, the policy statement was last amended in November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP.  For that reason, "a growing number of district courts have concluded the Commission lacks" a policy statement applicable to the post-First Step Act statute.  *United States v. Mondaca*, No. 89-CR-0655, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020) (internal quotation marks omitted); *see also United States v. Brown*, 411 F. Supp. 3d 446, 449-50 (S.D. Iowa 2019)

16

(citing cases).  In *United States v. Cantu*, the Court explained:
"Given the changes to the statute, the policy-statement provision
that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer
fits with the statute and thus does not comply with the
congressional mandate that the policy statement must provide
guidance on the *appropriate use* of sentence-modification provisions
under § 3582."  No. 1:05-CR-458-1, 2019 WL 2498923 *4 (S.D. Tex.
June 17, 2019) (emphasis original).  Similarly, in *United States v.
Redd*, the court noted that § 1B1.13 "by its terms applies only to
motions for compassionate release filed by the BOP Director, not
motions filed by defendants."  __ F.Supp.3d __, 2020 WL 1248493
*6 (E.D. Va. Mar. 16, 2020).  Therefore, the court concluded, "there
does not currently exist, for the purposes of satisfying the First Step
Act's 'consistency' requirement, an 'applicable policy statement.'"
*Id.*

Even where courts have not deemed § 1B1.13 entirely
inapplicable due to the lack of amendment, they have held that
judges have authority based on the catch-all provision in
Application Note 1(D) to find extraordinary and compelling reasons
other than those listed.  *See, e.g.*, *United States v. Fox*, No. 2:14-CR-

17

03, 2019 WL 3046086 *3 (D. Me. July 11, 2019) (stating that the existing policy statement provides "helpful guidance," but "is not ultimately conclusive given the statutory change").  In *Redd*, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance."  2020 WL 1248493 at *7 (citing cases); *see also United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719 *2 (D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (internal quotation marks omitted)).

Accordingly, this Court has authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case to include compelling family circumstances, present an extraordinary and compelling basis for a sentence reduction, regardless of whether it explicitly falls within one of the existing categories in § 1B1.13 commentary.

2.  *COVID-19 Is an Unprecedented and Rapidly-
Expanding Global Health Emergency that Presents a
Serious Risk to Vulnerable Populations.*

On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus which causes COVID-19 as a pandemic.[21]  "COVID-19 is a serious disease" that makes certain populations of people severely ill and can lead to death.[22]  To be certain, individuals need not fall within one of the at-risk categories to experience complications, including death, from contracting the virus.  The current best estimate is that the fatality rate among all demographics "is 5-35 times the fatality associated with influenza infection."[23]  COVID-19 has infected more than 20 million people worldwide, leading to more than 700,000 deaths.[24]  On March 26,

---

[21] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS.

[22] Declaration, Chris Beyrer, MD, MPH, Professor of Epidemiology, Johns Hopkins Bloomberg School of Public Health, ¶ 5 (Mar. 16, 2020), https://www.aclu-md.org/sites/default/files/field_documents/ex_d_-_beyrer_declaration_final.pdf.

[23] *Id.* at ¶11; *see also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26 EID JOURNAL (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.

[24] *Coronavirus COVID-19 Global Cases*, Center for Systems Science and Engineering (CSSE) at Johns Hopkins University, https://coronavirus.jhu.edu/map.html (last visited August 12, 2020) (updating regularly).

2020, the United States became the global leader in COVID infections,[25] and have exceeded 5 million confirmed cases. The number of confirmed COVID-19 cases continues to rise exponentially, but reported numbers underrepresent the true scope of the crisis—"experts believe that the United States still isn't testing enough people to detect the outbreak's true spread."[26] Underreporting from a lack of testing is especially true within the BOP.

Conditions of imprisonment create the ideal environment for the transmission of contagious diseases.[27] "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread

---

[25] Tom Porter, *The US is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's*, Business Insider (Mar. 26, 2020), https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-china-2020-3.

[26] Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an AmPierren Catastrophe*, The Atlantic (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-amPierrens-are-sick-lost-february/608521/.

[27] Joseph A. Bick, *Infection Control in Jails and Prisons* 1047-55, Clinical Infectious Diseases 45(8) (2007), at https://academic.oup.com/cid/article/45/8/1047/344842.

once introduced."[28]  The CDC recognizes the difficulty of preventing

the introduction of COVID-19 into prison facilities:

> There are many opportunities for COVID-19 to be introduced into a
> correctional or detention facility, including daily staff ingress and
> egress; transfer of incarcerated/detained persons between facilities
> and systems, to court appearances, and to outside medical visits;
> and visits from family, legal representatives, and other community
> members. Some settings, particularly jails and detention centers,
> have high turnover, admitting new entrants daily who may have
> been exposed to COVID-19 in the surrounding community or other
> regions.[29]

According to health experts, incarcerated individuals "are at special

risk of infection, given their living situations, "and "may also be less

able to participate in proactive measures to keep themselves safe;"

"infection control is challenging in these settings."[30]  Crowding,

inadequate ventilation, and security issues all contribute to the

spread of infectious disease in jails and prisons.[31]  Hand sanitizer,

an effective disinfectant recommended by the CDC to reduce

---

[28] Centers for Disease Control and Prevention (CDC), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[29] *Id.*
[30] "Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.
[31] Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

transmission rates, is contraband in jails and prisons because of its alcohol content.[32]  Additionally, incarcerated people tend to be in poorer health than the general population.  According to a recent Bureau of Justice Statistics study, approximately half of state and federal prisoners and jail inmates have chronic conditions such as cancer, high blood pressure, diabetes, cirrhosis of the liver, heart disease, and asthma.[33]  Medical care of prisoners is limited at the best of times.[34]

---

[32] Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA Journal (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[33] Laura M. Maruschak et al., *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, Bureau of Justice Statistics, NCJ 248491, 1 (Rev. Oct. 4, 2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[34] *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf (finding that the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions); U.S. Dep't of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf (finding that BOP facilities and services, including medical services, were inadequate to meet the needs of an aging prison population leading to delays in medical treatment for prisoners with acute and chronic heart and neurological conditions, who wait an average of 114 days to see medical specialists); David Patton, S*tatement from Federal Defenders of New York*, FEDERAL DEFENDERS OF NEW YORK (Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-defenders-of-new-york.html.

Because of these dangers, the public health community is insistent on the critical need to rapidly reduce our prison populations, both for the health of our inmates and the health of the community as a whole:

> It is . . . an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible . . . Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.[35]

 "We need to take the unprecedented step TODAY of providing urgent release to everyone in the jails who is at risk of serious morbidity and mortality from COVID."[36]  On March 23, 2020, a bipartisan group of fourteen senators wrote to Attorney General Barr and the Director of the Bureau of Prisons to express "serious concern for the health and wellbeing" of those inmates "most vulnerable to infection."[37]  They noted that "[c]onditions of confinement do not afford individuals the opportunity to take

---

[35] Beyrer, *supra* n.22 at ¶¶ 34, 36.

[36] Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, The New Yorker (Mar. 20, 2020) (quoting Rachael Bedard, Rikers Island Geriatrician), https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus.

[37] Letter from Senator Charles Grassley et al. (Mar. 23, 2020), https://www.grassley.senate.gov/news/news-releases/durbin-grassley-colleagues-press-trump-administration-transfer-vulnerable-inmates.

proactive steps to protect themselves, and prisons often create the ideal environment for the transmission of contagious disease." *Id.* The senators called on the BOP to use existing tools like the elderly prisoner home confinement program and compassionate release to discharge vulnerable inmates from prison. *Id.*

As of August 13, 2020, the BOP's COVID-19, Coronavirus webpage, which is updated daily at 3:00 p.m., shows 1,296 inmates and 571 staff members with active confirmed cases of COVID-19. https://www.bop.gov/coronavirus/.  And these are just the confirmed infections.  Another 9,824 inmates and 817 staff members have been deemed recovered from the virus.  *Id.*

Because the danger of contracting COVID-19 in the BOP is statistically profound and urgent, and because Mr. Marshall may stands at high risk for contracting and experiencing serious complications from the disease due to his history of hypertension, pre-diabetes, possible heart defect, and *pectus excavatum,* this Court may, in its discretion, determine that the combination of factors present an extraordinary and compelling basis for a sentence reduction in this case.

**C.    With full consideration of the § 3553(a) factors, including the COVID-19 Pandemic, Mr. Marshall's time served, in addition to a term of home confinement, coupled with his term of supervision, constitutes a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing.**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).  Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a).  In the time that he has served in the BOP, Mr. Marshall has worked for Unicor, earning the "all-star award."  He has participated in educational and vocational programming, having completed a 225 hour small gas engine course, 125 hour automotive engine course, and a Commercial Driver's License course, in addition to others.  He has also participated in substance abuse treatment.  He has not received any disciplinary infractions since 2015.

Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents.  Although the circumstances of the

present offense qualified Mr. Marshall for the sentence of
imprisonment that this Court originally imposed, the sentencing
purpose of just punishment does not warrant a sentence that
includes exposure to a life-threatening illness.  In fact, the Eighth
Amendment's prohibition on cruel and unusual punishment
includes unreasonable exposure to dangerous conditions in
custody.  *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also
Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying
*Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d
615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious
diseases caused by overcrowding conditions).

    While Mr. Marshall may be among those who are at-risk of
death or serious illness from COVID-19, as a Bureau of Prisons
inmate, it is impossible for him to follow the CDC's
recommendations to protect himself from exposure to this highly-
transmissible disease.[38]  Mr. Marshall's risk of serious illness or

---

[38] *See* The New York Times, *Chicago's Jail is Top U.S. Hot Spot as Virus Spreads
Behind Bars* (Apr. 9, 2020) (Measures taken by jail administrators "have not
prevented a dizzying pace of infection among a population in which social
distancing is virtually impossible and access to soap and water is not
guaranteed."), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-
county-jail-chicago.html.

death from the unprecedented global pandemic, together with all of the other relevant factors in this case, presents an extraordinary and compelling basis for sentence reduction.

The totality of the circumstances demonstrate that reducing Mr. Marshall's sentence to time served to be followed by a term of home confinement as a condition of supervised release, may be considered "sufficient, but not greater than necessary," to serve the purposes of sentencing under § 3553(a).  He has already completed a more than a significant portion of his 20-year sentence and is eligible for release to a halfway house on May 20, 2022.  Together with a six-year term of supervised release and a period of home confinement, time served may be considered more than sufficient. He asks this Court to consider the above in granting this Motion and releasing him to an early period of home confinement.

Mr. Marshall proposes that he will live with his father Delbert Marshall Sr. in Springfield, Illinois.  There, he will have every reason to self-quarantine and protect both his health and that of his family.

WHEREFORE, the defendant respectfully requests that this Honorable Court grant him compassionate release.

27

Date: August 13, 2020                Respectfully submitted,

                                     DELBERT MARSHALL, Defendant

                                     By: s/ *Rosana E. Brown*
                                     Rosana E. Brown
                                     Assistant Federal Public Defender
                                     Office of the Federal Public Defender
                                     600 E. Adams, 3rd Floor
                                     Springfield, Illinois 62701
                                     Telephone: (217) 492-5070
                                     Fax: (217) 492-5077
                                     E-mail: rosie_brown@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the United States Attorney's Office.  I also certify I have mailed the foregoing document by First Class Mail within three calendar days to the non-CM/ECF participant: Mr. Delbert Marshall.

                                     By: s/ *Rosana E. Brown*
                                     Rosana E. Brown
                                     Assistant Federal Public Defender
                                     Office of the Federal Public Defender
                                     600 E. Adams, 3rd Floor
                                     Springfield, Illinois 62701
                                     Telephone: (217) 492-5070
                                     Fax: (217) 492-5077
                                     E-mail: rosie_brown@fd.org